# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

AMERICAN ALLIANCE FOR
EQUAL RIGHTS,

*Plaintiff,*

v.

WINSTON & STRAWN LLP,

*Defendant.*

Case No. 23-cv-4113

# VERIFIED COMPLAINT

1.　　The law abhors racial discrimination. The lawyers who help administer that law are supposed to abhor it too. The ethical rules punish lawyers who "manifest by words or conduct, bias or prejudice based on race." Tex. Discipl. R. of Prof'l Conduct 5.08.

2.　　Yet Winston & Strawn has been racially discriminating against future lawyers for years. The Firm's "1L LCLD Scholars Program" discriminates against certain applicants because of their race. This prestigious program pays a five-figure stipend and leads to a six-figure job. But law students cannot get it unless they belong to a group that is "diverse," "disadvantaged," or "historically un-derrepresented"—Winston's shorthand for not a straight white male. So between two straight men—one black and one white—the latter can't apply because of his skin color.

3.　　This crude discrimination was never lawful. *See, e.g., Parents Involved in Cmty. Sch. V. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 722-23 (2007). But in case Winston needed another reminder, *SFFA v. Harvard* reaffirms that "[e]liminating racial discrimination means eliminating all of it." 143 S. Ct. 2141, 2161 (2023). No racial discrimination is benign: It always "demeans the dignity and worth'" of every American "'to be judged'" by his or her race "'instead of by his or her own merit and essential qualities.'" *Id.* at 2170.

4.　　That principle is true under the Constitution, true under Title VI, and true under 42 U.S.C. §1981—the federal statute that bars private employers, like Winston, from discriminating based

on race when making contracts. Because Winston's 1L LCLD Scholars Program is a contract that discriminates on its face, it violates §1981.

## PARTIES

5.      Plaintiff, the American Alliance for Equal Rights, is a nationwide membership organization dedicated to ending racial classifications and racial preferences in America.

6.      The Alliance was founded, and was approved by the IRS as a 501(c)(3) tax-exempt organization, in 2021. Its board is Edward Blum (president); Richard Fisher (treasurer); and Kenny Xu (secretary). The Alliance has nearly 100 members, and its membership continues to grow.

7.      The Alliance's members are actively involved. Members voluntarily join the Alliance. They pay dues. They receive regular updates. And they offer input about the Alliance's litigation and other activities.

8.      The Alliance has members who are ready and able to apply for Winston's 1L LCLD Scholars Program in the upcoming cycle, including Members A and B.

9.      Members A and B pay dues, believe in the Alliance's mission, and support this lawsuit. They are currently pseudonymous because, as law students, they fear reprisal from other students on campuses, their professors, future employers, and the public. They also fear that Winston would hold their involvement against them when selecting scholars.

10.     Defendant, Winston & Strawn, is a nationally recognized law firm.

11.     Winston opened its Houston office in 2011, and that office "has grown to more than 68 attorneys" since. *Houston*, perma.cc/HVJ3-N6DP. The Houston office participates in the 1L LCLD Scholar Program. It regularly hires 1L LCLD Scholars, including in 2023.

## JURISDICTION AND VENUE

12.     This Court has subject-matter jurisdiction under 28 U.S.C. §1331.

13.     Venue is proper under 28 U.S.C. §1391 because a substantial part of the events giving rise to the claims occurred in Houston.

# FACTS

## A. Winston defines "diverse" in terms of race.

14.     At Winston, diversity is "embedded … into the fabric of the firm." Vault, *Winston & Strawn Summer Program – The Firm Says*, perma.cc/V4KJ-TFPS. It's "a high priority." NALP, *Winston & Strawn 1L Diversity Scholars Program*, perma.cc/4639-H3BP. It's a "paramount core value." Vault, *Winston & Strawn 2022 Diversity Survey* 7. And it's "a strategic goal" that is "formally incorporated into the firm's strategic business plan." *Id.* Winston "back[s] this up" with "numerous recruitment, retention, and advancement initiatives for women, racial/ethnic minority, and LGBTQ+ attorneys." *Diversity, Equity & Inclusion*, perma.cc/7JF7-EKC8.

15.     Winston's Houston office "has a robust diversity, equity and inclusion program with numerous initiatives to recruit, retain, develop, and promote diverse lawyers." NALP, *Winston & Strawn LLP – Houston – Recruitment – Recruitment Methods*, perma.cc/P9HV-YAHT. These "initiatives" include "affirmative action plans for racial/ethnic minorities" and "scholarships to racial/ethnic minority law students." *Id.*

16.     At Winston, "diverse" primarily means "non-white." Winston's "Chief Diversity & Inclusion Officer, Sylvia James," recently addressed "what Winston has done to address the underrepresentation of racial/ethnic minorities in the legal industry." *Sylvia James Discusses Big Law's Diversity Advancements* (May 31, 2022), perma.cc/S45P-2NNP. She admitted, while defining the word "diverse," that "[a]fter the murder of George Floyd, there was a focus on race in a way that I hadn't seen in my 16 years of focusing on law firm diversity." *Id.*

17.     "In furtherance of [Winston's] strategic business goal[s] … the firm's Executive Committee adopted new three-year strategic DEI goals to increase significantly the representation of racial/ethnic minority … lawyers in [its] workforce." Vault, *Winston & Strawn 2021 Diversity Survey* 7-8, perma.cc/ZPQ2-MCHQ. To accomplish those goals, Winston "set formal, measurable targets for increasing diversity." *Id.* These targets include "specific benchmarks for the representation of … racial/ethnic minorities lawyers." *Id.*

18.     Winston does not consider someone "diverse" if they are straight, white, and male. When discussing the Firm's 2018 "Diverse Lawyers Retreat," for instance, Winston invited only "minority and LGBTQ lawyers." *Transformative Diverse Lawyers Retreat Paves Path to Success*, perma.cc/4FGY-X947; *accord Retention & Advancement Initiatives*, perma.cc/WNK8-ARDY (opening the "Diverse Lawyers Retreat" only to "self-identified racial/ethnic minority and LGBTQ+ attorneys"). When discussing a "Virtual Diverse Lawyers Retreat," Winston again invited only "minority and LGBTQ lawyers." *2021 Diversity Survey* 19. And when Winston designed a "mentorship" program for "diverse attorneys," the program was open only to "women, racial/ethnic minorit[ies], and LGBTQ associates." *Id.* at 23; *accord Retention & Advancement Initiatives*.

19.     On its main DEI page, Winston reports its progress based on only three demographics: "women," "racial/ethnic minorities," and "LGBTQ+." *Diversity, Equity & Inclusion* (last visited Oct. 29, 2023), winston.com/en/diversity-equity-and-inclusion. Although every individual is a unique human being, Winston reports that only "64% of Winston associates are diverse." *Id.* It does not consider the remaining 36%—the straight white males—to be "diverse."



20.     Winston boasts that it has received the Mansfield Certification every year since the award's inception in 2017. *Winston Earns Diversity Lab's Mansfield Certification Plus for Sixth Consecutive Year* (Oct. 10, 2023), perma.cc/2LJ4-7A9A. To win this award, a law firm must ensure that, for any open leadership role, 30% of the candidates are "diverse." In 2017, Mansfield defined diverse to mean "women" and "underrepresented racial and ethnic lawyers." Diversity Lab, *Mansfield Rule: Boosting Diversity in Leadership*, perma.cc/79BR-WKQK. It has since added "LGBTQ+ lawyers" and "lawyers with disabilities," but no other groups. *Id.*

## B. Winston's 1L LCLD Scholars Program excludes certain applicants based on race.

21.     Winston runs the 1L LCLD Scholars Program, which "support[s] diverse summer associates." *2021 Diversity Survey* 13. "Winston hires 8-12 diverse summer associates through the LCLD's Diverse 1L Scholars Program every year." *Id.* In 2021, Winston "hired 11 diverse 1L law students" through the program. *Summer Associate Tips for Success.* In 2022, Winston hired roughly a dozen more. *2022 Diversity Survey* 13. And it hired "[e]leven LCLD Scholars" in 2023. *Diversity Recruitment Initiatives*, perma.cc/3BVE-ZQ3W.

22.     Compensation for the 1L LCLD Scholar Program is "based on the first-year associate annual salary of $215,000." *Law Students*, perma.cc/KP5K-9JA8. Program participants make more than $4,100 a week, *Houston –Summer Compensation*, and they bring home more than $41,000 per summer, *see* Chambers Associate, *Winston & Strawn*, perma.cc/7NEZ-LNED. What's more, they have the

"[p]otential to receive a $50,000 scholarship if [they] complete both [of Winston's] 1L and 2L summer associate programs and accept an offer of full-time employment." *Law Students*.

23.    Winston's 1L LCLD scholars enjoy several other benefits too. They receive "[c]hallenging work experience on complex disputes and transactions." *Id.* They "have an opportunity to attend the LCLD Scholars Summit [and] participate in the firm's annual Diversity Roundtable." *Id.* And they get to "spend part of the summer working directly with one of [Winston's] clients." *Id.*

24.    In exchange for a five-figure stipend and a shot at a six-figure job, LCLD scholars promise to spend their summer working for Winston and "one of [its] clients." *Id.* Many scholars "complete" both of their "1L and 2L summer[s]" at Winston and "accept an offer of full-time employment" after graduation. *Id.*

25.    Applicants for the Firm's 1L LCLD Scholars Program must, among other requirements, be members of "a disadvantaged and/or historically underrepresented group in the legal profession." *Law Students*; *see also Law Students (updated)*, perma.cc/BP57-V2QF. This requirement discriminates based on race.

26.    Applicants satisfy this criteria if they are black, Hispanic, or Asian. Per the American Bar Association in 2020, "White men and women are still overrepresented in the legal profession compared with their presence in the overall U.S. population," while "[n]early all people of color are underrepresented in the legal profession compared with their presence in the U.S. population." ABA, *Lawyers by Race & Ethnicity*, tinyurl.com/49urhr87. Blacks are 5% of lawyers (but 13.4% of the population); Hispanics are 5% of lawyers (but 18.5% of the population); and Asians are 2% of lawyers (but 5.9% of the population). *Id.*

27.    Applicants do not satisfy Winston's criteria if they are white, male, affluent, non-disabled, and non-LGBTQ. No study, data, or speaker of English would consider these individuals to be

members of a "group" that is "disadvantaged and/or historically underrepresented" in law. Neither does Winston.

28.     The program's "goal," according to Winston, is to "have the representation of diverse law students in [its] summer associate classes meet or exceed National Association for Law Placement (NALP) averages"—a goal that Winston has "achieved and surpassed … for three consecutive years." *Diversity, Equity & Inclusion*. The only diversity metrics that NALP measures for summer associates, however, are "women" and "people of color." *2022 Report on Diversity in U.S. Law Firms* 14-18, tinyurl.com/ajeatkyh.

29.     Winston's hiring data reflect this understanding. In 2021, Winston hired "19 [t]otal 1L summer associates at the firm." *2022 Diversity Survey* 14. Of them, "11 out of the 19 1L summer associates were hired through the firm's diversity scholarship" program, *id.*, which is open only to "Diverse 1Ls," *id.* at 16. According to Winston's data, precisely 11 of the 19 1L summer associates—the same number of summers who were hired through the 1L LCLD program—were non-white: six were black, three were Hispanic, and two were Asian. *Id.* at 14. So roughly 55% black, 27% Hispanic, and 18% Asian. *Id.* The Firm's traditional 2L summer program for that year, by comparison, was 10% black, 9% Asian, and 0% Hispanic. *Id.* at 15.

30.     Winston recently convened a task force to study issues concerning "historically underrepresented lawyers." Its name? The "*Racial* Equity Task Force." *Diversity, Equity & Inclusion* (emphasis added).

31.     Winston places LCLD on its list of "women, minority, and LGBTQ+ bar associations and organizations." *Sponsors & Partnerships* (archived Oct. 25, 2023), perma.cc/8QKB-J9C9.

32.     Other law firms with similar programs admit that they are race based.

33.     For decades, Perkins Coie LLP had a "diversity" fellowship for 1Ls that required applicants to, among other things, have "[m]embership in a group historically underrepresented in the

legal profession." This category, Perkins explained, "includ[es] students of color, students who identify as LGBTQ+, and students with disabilities." After the Alliance sued Perkins for racial discrimination under §1981, Perkins eliminated this "membership" requirement. *See generally Am. Alliance for Equal Rights v. Perkins Coie LLP*, No. 3:23-cv-1877 (N.D. Tex.).

34.     Morrison & Foerster LLP likewise ran a 1L summer program, called the Keith Wetmore 1L Fellowship for Excellence, Diversity, and Inclusion. Just like Winston, Morrison's listed "Eligibility Criteria" included "Membership in a historically underrepresented group in the legal profession." And like Perkins, Morrison defined that requirement to "includ[e] racial/ethnic minority groups and members of the LGBTQ+ community." After the Alliance sued Morrison for racial discrimination under §1981, Morrison eliminated this "membership" requirement. *See generally Am. Alliance for Equal Rights v. Morrison & Foerster LLP*, No. 1:23-cv-23189 (S.D. Fla.).

35.     Yet Winston refuses to change its 1L LCLD Scholars program. In the wake of *SFFA v. Harvard*, Winston didn't retire the program, change the program, or even suggest that it was reviewing the program's legality. Winston continues to actively advertise the program on its website.

36.     Per Winston, applications for the program will be available "in the coming weeks." *Law Students (updated)*.

37.     The Alliance thus wrote a letter to Winston, citing the changes made by Perkins and Morrison and asking whether Winston plans to proceed with the program in 2024 or change it. Winston responded on October 13, 2023, crowing that it was "proud of the program" and that the program "will continue" unchanged.

38.     Winston claimed the program was "legal" because white applicants can be "in a disadvantaged and/or historically underrepresented group." In other words, because a gay white man can be chosen, it doesn't matter that a straight white man cannot.

39.     Sometime after Winston responded to the Alliance's letter, it quietly modified its description of the program. Its website now says, for the first time, that "[a]pplicants of all races, ethnicities, genders, disabilities, orientations, and socio-economic or other backgrounds are eligible to apply for Winston's LCLD 1L Scholars Program." *Law Students (updated)*.

40.     Though Winston will now apparently let everyone "apply," it does not say that everyone has an equal chance of being selected, regardless of race. In other words, race remains a factor, and, between two otherwise equal applicants, Winston can prefer a racial minority to a white student. Per its letter to the Alliance, it will continue doing so because the program has not changed.

41.     In fact, under "Eligibility Criteria," the firm continues to say that the program's requirements "include":

- Interest in practicing law after graduation in one of our U.S. offices
- A record of excellent academic achievement, as reflected in undergraduate and law school transcripts
- Demonstrated leadership abilities and interpersonal skills
- ***Membership in a disadvantaged and/or historically underrepresented group in the legal profession***
- A personal statement

*Id.* (emphasis added). The highlighted criterion is no more optional than, say, submitting a "personal statement."

## C. Winston's racial exclusion injures the Alliance's members.

42.     The Alliance has members who are harmed by Winston's racially discriminatory program. Members A and B, for example, are ready and able to apply to the 1L LCLD Scholars Program once a court orders Winston to stop racially discriminating.

43.     Member A satisfies all the criteria for the program, except he lacks membership in a disadvantaged and/or historically underrepresented group in the legal profession.

44.     Member A is a first-year student in good standing at an ABA-accredited law school.

45.     Member A has a record of excellent academic achievement. He received one of the highest merit-based scholarships to attend college, where he graduated with honors. His law school is highly ranked and well regarded. Winston has hired graduates from his law school before.

46.     Member A also has strong interpersonal skills and leadership abilities. He has a wide range of work experience managing and interacting with people of all stripes—from customer service and sales, to teaching grade school, to working at a major company.

47.     Member A is most interested in Winston's Houston office. He loves Texas. He went to college there, worked there for several years, and thinks Houston is an ideal place to start a family and a legal career.

48.     Member B likewise satisfies all the criteria for the program, except he lacks membership in a disadvantaged and/or historically underrepresented group in the legal profession. He is a first-year law student in good standing at an ABA-accredited law school.

49.     Like Member A, Member B has a record of excellent academic achievement, as well as strong interpersonal skills and leadership abilities. He graduated from what many consider the highest-ranked college in the country. His law school is highly ranked and well regarded, and Winston has hired from it in the past. Member B was actively involved in several activities on campus. And he has held senior leadership positions in several nonprofits.

50.     Members A and B want to apply to the 1L LCLD program because it will provide them with invaluable work experience. It's a prestigious program that would give them great professional opportunities. It would help them make professional connections, find mentors, and interact with clients during their summer at Winston.

51.     If a court ordered Winston to give students like them an equal chance to compete, Members A and B would promptly submit all the requested application materials, including their law-school grades.

# CLAIM FOR RELIEF
## Violation of the Civil Rights Act of 1866
## 42 U.S.C. §1981

52.     The Alliance repeats and realleges each of its prior allegations.

53.     Winston & Strawn is violating 42 U.S.C. §1981 by intentionally excluding certain applicants from contractual relationships because of their race. Section 1981 states that "[a]ll persons … shall have the same right … to make and enforce contracts … and to the full and equal benefit of all laws … as is enjoyed by white citizens." 42 U.S.C. §1981(a).

54.     Section 1981 applies to governmental and "nongovernmental" actors alike. *Id.* §1981(c). The statute contains a private right of action "against discrimination in private employment on the basis of race." *Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 459-60 (1975). And it authorizes both equitable relief and damages. *Id.*

55.     Section 1981's "broad terms" bar discrimination "against, or in favor of any race," *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 298 (1976), and its universal mandate "protects the equal right of all persons … without respect to" skin color, *Domino's Pizza, Inc v. McDonald*, 546 U.S. 470, 474 (2006) (cleaned up). As the Fifth Circuit has said, §1981 "forbids racial discrimination in the making and enforcement of private contracts" regardless of "whether the aggrieved party is black or white." *Bobo v. ITT, Cont'l Baking Co.*, 662 F.2d 340, 342 (5th Cir. 1981). And that colorblind command covers "private employment contracts" too. *Id.*

56.     Winston's 1L LCLD program implicates the right to "make … contracts." 42 U.S.C. §1981(b). A contract "need not already exist" to trigger §1981. *Domino's Pizza*, 546 U.S. at 475. The statute "protects the would-be contractor along with those who have already made contracts." *Id.* As a result, §1981 "offers relief when racial discrimination blocks the creation of a contractual relationship, as well as when racial discrimination impairs an existing contractual relationship." *Id.*

11

57.     The 1L LCLD program is a contractual relationship, and it's designed to lead to other contractual relationships too. When a law student accepts a spot in Winston's 1L LCLD program, he agrees to work at the firm during his 1L summer. In exchange, the firm promises to pay him more than $4,100 a week and provide him with other benefits, like training, networking, and mentoring. And when this contract expires, Winston often inks other deals with its 1L LCLD Scholars. At the end of their summer, many fellows agree to return the following summer and after graduation, in exchange for a five-figure stipend and a six-figure salary.

58.     "[P]roof of a facially discriminatory employment policy"—or proof of "a corporate decision maker's express[ed] desire to avoid hiring employees in [a] protected group"—is "direct evidence of discriminatory intent." *Amini v. Oberlin Coll.*, 440 F.3d 350, 359 (6th Cir. 2006). Here, there's both. Winston's 1L LCLD program "facially discriminates" against white people. *Id.* And the firm's "corporate decision maker[s]" have expressed a "desire to avoid hiring [straight, white] employees" for that program. *Id.* The Alliance, therefore, "is not required to make further allegations of discriminatory intent or animus." *Juarez v. Nw. Mut. Life Ins.*, 69 F. Supp. 3d 364, 370 (S.D.N.Y. 2014).

59.     The firm cannot escape liability by saying that—along with discriminating against whites—it also discriminates against applicants who aren't gay or female. An employer cannot "discriminate against some employees on the basis of race … merely because he favorably treats other members" of that race. *Connecticut v. Teal*, 457 U.S. 440, 455 (1982). "So long as the plaintiff's [race] was one but-for cause" of his exclusion, "that is enough." *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1739 (2020).

## PRAYER FOR RELIEF

The Alliance asks this Court to enter judgment for it and against Winston and provide the following relief:

A.     a declaration that Winston & Strawn's 1L LCLD Scholars Program violates §1981;

B.      a temporary restraining order and preliminary injunction barring Winston & Strawn from closing the application window or selecting scholars for the 2024 1L LCLD program and from considering race as a factor when selecting scholars;

C.      a permanent injunction ordering Winston to end the 1L LCLD program as currently constituted; barring Winston from considering race as a factor when selecting scholars; ordering Winston to formulate new eligibility requirements for the program that are strictly race neutral; and if necessary, ordering Winston to redo applications and selections for 1L LCLD scholars in a strictly race-neutral manner;

D.      nominal damages of $1;

E.      reasonable costs and expenses of this action, including attorneys' fees, under 42 U.S.C. §1988 and any other applicable law; and

F.      all other relief that the Alliance is entitled to.

Dated: October 30, 2023                                  Respectfully submitted,

                                                         /s/ James F. Hasson
Adam K. Mortara*                                         Thomas R. McCarthy*
  (TN Bar No. 40089)                                       (VA Bar No. 47154)
LAWFAIR LLC                                              Cameron T. Norris*
40 Burton Hills Blvd., Ste. 200                            (TN Bar No. 33467)
Nashville, TN 37215                                        Lead Counsel
(773) 750-7154                                           James F. Hasson
mortara@lawfairllc.com                                     (TX Bar No. 24109982)
                                                           (SD Tex. No. 3735757)
                                                         R. Gabriel Anderson*
                                                           (TX Bar No. 24129302)
                                                         CONSOVOY MCCARTHY PLLC
                                                         1600 Wilson Blvd., Ste. 700
                                                         Arlington, VA 22209
                                                         (703) 243-9423
                                                         tom@consovoymccarthy.com
                                                         cam@consovoymccarthy.com
                                                         james@consovoymccarthy.com
                                                         gabe@consovoymccarthy.com

                                                         *pro hac vice forthcoming

13

# VERIFICATION

I, Edward Blum, declare as follows:

1.      I am the President of the American Alliance for Equal Rights, the plaintiff here.

2.      I have reviewed this complaint.

3.      For the allegations within my personal knowledge, I believe them all to be true.

4.      For the allegations not within my personal knowledge, I believe them all to be true based on my review of the cited policies and documents and based on my conversations with members of the American Alliance for Equal Rights, including Members A and B.

5.      I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 30, 2023

Edward Blum
President of American Alliance for Equal
Rights